BERNICE BOUIE DONALD,
concurring in part and dissenting in part.
While I agree with most of the majority’s analysis, I would conclude that Al-baugh is liable for half of the cost of all of the studies in Appendix B as well as those related to the two DCIs, as opposed to only those studies Syngenta submitted or generated prior to the termination of the Agreement.
Significantly, the language of the Agreement required Drexel to “maintain” its atrazine follow-on registration. In 2003 when the EPA cancelled all atrazine registrations, the only way that Drexel could have reregistered (and therefore “maintain[ed]” its atrazine registration per the Agreement) was to sign a Memorandum of Agreement (“MOA”) with the EPA and other atrazine registrants. The MOA required follow-on registrants to rely on Syngenta’s Appendix B data. It also required follow-on registrants to agree to pay for any future DCIs, which, we now know, constitutes the 2004 and 2005 DCIs.
The majority reasons that “[t]he studies Syngenta was generating and submitting to the EPA during the contract period •represented Drexel’s ‘future payments’ to Syngenta.” Maj. Op. at 473. That is not quite true. When Drexel signed the MOA, those “future payments” were definitively determined: the Appendix B studies as well as any DCIs. Further, per the Agreement, Drexel and Albaugh were to split the costs of data compensation paid “in order to maintain ” the atrazine registration. As the majority explained, Drexel “performed” by ensuring the continuation of the atrazine registration — namely, by obligating itself to pay for the Appendix B studies and any future DCIs. See Maj. Op. at 473. Therefore, Drexel would be deprived of the benefit of the bargain if Albaugh was not required to split the data compensation costs incurred “in order to maintain” the atrazine registration while the Agreement was in force.
Perhaps if the EPA had not required Drexel to commit to paying for the DCIs under the MOA, it would make sense to parse between the studies, as the majority does, and obligate Albaugh for only those studies that Syngenta generated or submitted to the EPA before it terminated the Agreement. But that is not what happened. Instead, the EPA required atra-zine follow-on registrants to agree to pay for the DCIs in advance, and the Agreement calls for Drexel and Albaugh to split those costs, as they were required “in order to maintain” the registration. Therefore, contrary to the majority, I would *476 require Drexel and Albaugh to split the costs of all the studies in Appendix B and related to the two DCIs.